**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

GINA AND ROMAN CHURNOVIC,     )
individually and on behalf of their     )
Minor child, Baby C,     )     Case No. 20-cv-1619
     )
     )     Judge Robert M. Dow, Jr.
     Plaintiffs,     )
     )
     v.     )
     )
B.J. WALKER, *et al.*,     )
     )
     Defendants.     )

**MEMORANDUM OPINION AND ORDER**

Gina and Roman Churnovic ("Plaintiffs") bring this action individually and on behalf of their minor child, Baby C, against Defendants B.J. Walker, former Acting Director of the Illinois Department of Children and Family Service ("DCFS"); Nora Harms-Pavelski, former DCFS Deputy Director of Child Protection; Silver Cross Hospital and Medical Center ("Silver Cross"); Carla Mistro, a registered nurse employed by Silver Cross; and Mary Pierson, a registered nurse employed by Silver Cross (collectively "Defendants"). Plaintiffs allege that Defendants violated their substantive due process right to familial integrity by causing a DCFS investigation after they refused medically unnecessary eye ointment on behalf of their newborn, Baby C. Defendants Walker and Harms-Pavelski (the "DCFS Defendants") moved to dismiss Plaintiffs' complaint [30], as did Defendants Silver Cross, Mistro, and Pierson (the "Silver Cross Defendants") [23]. For the reasons stated below, the DCFS Defendants' motion to dismiss [30] is denied and the Silver Cross Defendants' motion to dismiss [23] is granted. Plaintiffs' claims against the Silver Cross Defendants are denied without prejudice. Plaintiffs are given until May 12, 2021 to file an amended complaint if they wish to do so. If Plaintiffs wish to stand on the claim that remains from

their original complaint, they should so advise Defendants and the Courtroom Deputy. A joint status report, including a discovery plan, is due 7 days after Plaintiffs either file an amended complaint or advise that they will stand on the original complaint.

## I.      Background

The following facts are taken from Plaintiffs' complaint [1] and are assumed to be true for the purpose of considering Defendants' motions to dismiss. *Killingsworth v. HSBC Bank Nev., N.A.*, 507 F.3d 614, 618 (7th Cir. 2007). Plaintiffs are a married couple who reside within this District. [*Id.*, at ¶ 8]. Defendants Walker and Harms-Pavelski are the former Acting Director of DCFS and former Deputy Direct of DCFS, respectively. [*Id.*, at ¶¶ 9–10]. Walker and Harms-Pavelski are each being sued in their individual capacity. [*Id.*]. Defendants Mistro and Pierson are employed as registered nurses at Silver Cross. [*Id.*, at ¶¶ 12–13]. Defendant Silver Cross is an Illinois non-profit corporation. [*Id.*, at ¶ 11].

### A.      The Eye Ointment Policy

Erythromycin eye ointment can be applied to a newborn's eyes when there is a risk that the newborn has been exposed to an active gonorrhea or chlamydia infection during childbirth. [*Id.*, at ¶ 60]. Newborn babies born to uninfected mothers are at zero risk of exposure to these diseases during childbirth. [*Id.*, at ¶ 63]. To be effective, the eye ointment must be applied within the first hour of birth. [*Id.*, at ¶ 35]. Between 2015 and 2018, DCFS had an express policy that parental refusal of eye ointment was *per se* medical neglect such that if a hospital called DCFS to report a parent's refusal of eye ointment, DCFS was obligated to open an investigation for medical neglect. [*Id.*, at ¶ 42]. Defendants Walker and Harms-Pavelski were actively involved in the creation, dissemination, and implementation of this *per se* medical neglect policy. [*Id.*, at ¶ 43]. The policy was part of DCFS's internal procedures for its employees. [*Id.*, at ¶ 44]. Pediatricians in Illinois

worked with DCFS, hospitals, and physicians to circulate information from DCFS indicating that doctors and hospitals must report refusal of eye ointment as *per se* medical neglect. [*Id.*, at ¶ 46]. Doctors, hospital representatives, and DCFS officials and caseworkers attended meetings, engaged in written and verbal communications, and otherwise worked together to develop and disseminate the coordinated DCFS and hospital *per se* medical neglect policies. [*Id.*, at ¶ 47]. As a result of these policies, doctors and hospitals reported families to DCFS for merely refusing application of eye ointment to their newborns; DCFS, in turn, responded to these calls by opening a DCFS investigation for medical neglect. [*Id.*, at ¶¶ 47–48].

Defendants Walker and Harms-Pavelski instructed and allowed DCFS caseworkers to threaten and coerce families who refused eye ointment treatment. [*Id.*, at ¶ 50]. They also encouraged other Defendants, hospitals, and medical personnel to similarly threaten and coerce families. [*Id.*, at ¶ 51]. All Defendants knew that refusal of eye ointment treatment was not medical neglect as that term is defined by Illinois law. [*Id.*, at ¶ 53]. At the time of Baby C's birth, Silver Cross had a policy of reporting a parent's refusal of the eye ointment treatment to DCFS as a case of medical neglect. [*Id.*, at ¶ 55].

### B.     Baby C's Birth and DCFS Investigation

Plaintiffs believed the application of the eye ointment was unnecessary and were concerned that the application would interfere with the immediate bonding between mother and baby, adversely affecting the baby's ability to breastfeed. [*Id.*, at ¶ 21]. Accordingly, before Baby C's birth, they wrote a birth plan indicating their intent to refuse the application of erythromycin eye ointment and provided the birth plan to a Silver Cross nurse. [*Id.*, at ¶ 20]. Despite this birth plan, while Gina was in labor, Defendant Mistro threatened the couple that if they refused the eye ointment, DCFS would be called to investigate the couple for medical neglect based on hospital

policy. [*Id.*, at ¶¶ 23–25]. Plaintiffs refused. [*Id.*, at ¶ 25]. Immediately after Baby C was born, Defendant Pierson asked Plaintiffs to allow the application of eye ointment to Baby C, explaining that per Silver Cross policy if they refused, she would call DCFS and report the couple for medical neglect. [*Id.*, at ¶¶ 27–28]. Defendants Mistro and Pierson continued to pressure Plaintiffs to allow the application of the eye ointment, and Plaintiffs continued to refuse. [*Id.*, at ¶¶ 30]. The eye ointment was not applied to Baby C within one hour of his birth, and Gina and Baby C were allowed to bond and breastfeed. [*Id.*].

Because Plaintiffs refused the eye ointment for Baby C, Defendant Pierson called DCFS and reported Plaintiffs for medical neglect of Baby C. [*Id.*, at ¶ 31]. That evening, a DCFS caseworker called Plaintiffs, informing them that DCFS was investigating their refusal of the eye ointment treatment as a case of medical neglect. [*Id.*, at ¶ 32]. Later that same night, a caseworker arrived at Silver Cross. [*Id.*, at ¶ 33]. Baby C was a few hours old and Gina and Baby C were attempting to establish a breastfeeding relationship. [*Id.*]. The caseworker told Plaintiffs that it was "silly" and "stupid" that she was there but that she was required to investigate because Silver Cross had reported Plaintiffs for medical neglect. [*Id.*, at ¶ 34]. The caseworker briefly examined Baby C, noting that he was healthy. [*Id.*, at ¶ 36]. The caseworker informed Plaintiffs that there was no medical neglect but that, in order to close the investigation, she would be required to do a home visit to inspect Plaintiffs' home and other children. [*Id.*, at ¶¶ 36–37]. Within a week after Plaintiffs brought Baby C home, the DCFS caseworker completed the home visit by briefly inspecting the house and requiring Plaintiffs to produce their other children for her viewing. [*Id.*, at ¶ 38]. The caseworker noted that Plaintiff's other children were healthy and that she had no concerns over Plaintiffs' ability to care for their children. [*Id.*]. The caseworker reiterated that the allegation was unfounded and, about a month later, she confirmed in a letter that the allegation of

4

medical neglect was unfounded. [*Id.*, at ¶¶ 38–39]. The DCFS caseworker summarized her

rational for concluding the report was unfounded as follows:

> Mother does not have a STD or medical issues that could be spread to the baby
> should the baby not have the prophylactic eye ointment. The treating Nurse
> Practitioner reported no medical neglect. Therefore, the Allegation of Medical
> Neglect is Unfounded.

[*Id.*, at ¶ 41].

Plaintiffs then brought this complaint against the DCFS Defendants and Silver Cross

Defendants, alleging that they conspired to violate their substantive due process rights to familial

integrity protected by the Fourteenth Amendment. [1, at ¶¶ 72–80]. All Defendants moved to

dismiss. [23; 30].

## II.    Legal Standard

To survive a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief

can be granted, the complaint first must comply with Rule 8(a) by providing "a short and plain

statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), such

that the defendant is given "fair notice of what the * * * claim is and the grounds upon which it

rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration in original) (quoting

*Conley v. Gibson*, 355 U.S. 41, 47 (1957)). The factual allegations in the complaint must be

sufficient to raise the possibility of relief above the "speculative level." *EEOC. v. Concentra

Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). "A

pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause

of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at

555). Dismissal for failure to state a claim under Rule 12(b)(6) is proper "when the allegations in

a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at

558. In reviewing a motion to dismiss pursuant to Rule 12(b)(6), the Court accepts as true all of

Plaintiffs' well-pleaded factual allegations and draws all reasonable inferences in Plaintiffs' favor. *Killingsworth*, 507 F.3d at 618. However, "[t]o survive a motion to dismiss, the well-pleaded facts of the complaint must allow the court to infer more than the mere possibility of misconduct." *Langworthy v. Honeywell Life & Acc. Ins. Plan*, 2009 WL 3464131, at *2 (N.D. Ill. Oct. 22, 2009) (citing *Iqbal*, 566 U.S. at 679).

## III. Analysis

### A. DCFS Defendants

DCFS Defendants Walker and Harms-Pavelski first argue that they are entitled to qualified immunity. Although qualified immunity is "an affirmative defense for pleading purposes, the plaintiff carries the burden of showing that defendants are not immune." *Sebesta v. Davis*, 878 F.3d 226, 233 (7th Cir. 2017). To do so, a plaintiff must "demonstrate that (1) the defendant violated a constitutional right; and (2) the right was clearly established at the time, so that a reasonable state actor would know her conduct was unlawful." *Id.* On the first prong, the DCFS Defendants argue that they did not violate Plaintiffs' constitutional rights because the act of investigating alleged child abuse does not violate the right to familial integrity. On the second prong, they argue that even if they violated Plaintiffs' constitutional rights, those rights were not clearly established. Next, the DCFS Defendants argue that even if the investigation violated Plaintiff's clearly established rights, they cannot be held liable because they were not personally involved. Finally, they argue that Plaintiffs claims against them are barred by the Eleventh Amendment.

1.      **Qualified Immunity**

   a.      **Violation of Plaintiffs' Right to Familial Integrity**

The Fourteenth Amendment to the United States Constitution provides that no State may "deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1.  "The Supreme Court has long recognized, as a component of 'substantive' due process, that parents have a liberty interest in familial relations, which includes the right to 'establish a home and bring up children.'"  *Doe v. Heck*, 327 F.3d 492, 517 (7th Cir. 2003), as amended on denial of reh'g (May 15, 2003) (quoting *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923)).  "Equally fundamental is the substantive due process right of a child to be raised and nurtured by his parents." *Brokaw v. Mercer Cnty.*, 235 F.3d 1000, 1018 (7th Cir. 2000).  Further, there is a "constitutional presumption that 'fit parents act in the best interests of their children,'" and "unless government officials have evidence calling into question the fitness of a parent, there is 'no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children.'"  *Heck*, 327 F.3d at 521 (quoting *Troxel v. Granville*, 530 U.S. 57, 68–69 (2000) (plurality opinion)).

That said, the right to familial integrity is not absolute.  *Brokaw*, 235 F.3d at 1019.  Instead, it is "limited by the compelling governmental interest in the protection of children particularly where the children need to be protected from their own parents."  *Id.* (quoting *Croft v. Westmoreland Cnty. Child. & Youth Servs.*, 103 F.3d 1123, 1125 (3d Cir. 1997)).  Thus, when considering familial integrity claims, "a balance must be reached between the fundamental right to the family unit and the state's interest in protecting children from abuse."  *Id.*  In balancing these interests, courts employ "the same reasonableness test used to evaluate Fourth Amendment claims" by considering "(1) the nature of the privacy interest upon which the action taken by the State

intrudes; (2) the character of the intrusion that is complained of; (3) the nature and immediacy of the governmental concern at issue; and (4) the efficacy of the means employed by the government for meeting this concern." *Heck*, 327 F.3d at 520. "This analytical framework allows courts to determine whether the governmental action taken was 'justified at its inception,' and 'reasonably related in scope to the circumstances which [allegedly] justified the interference in the first place.'" *Id.* (alteration in original) (quoting *Darryl H. v. Coler*, 801 F.2d 893, 903 (7th Cir. 1986)). "[C]ourts have recognized that a state has no interest in protecting children from their parents unless it has some definite and articulable evidence giving rise to a reasonable suspicion that a child has been abused or is in imminent danger of abuse." *Brokaw*, 235 F.3d at 1019.

Here, Plaintiffs allege that there was no basis to reasonably suspect them of child abuse or medical neglect because the eye ointment was not medically necessary, a fact known by all Defendants. [1, at ¶¶ 53, 63–65]. DCFS Defendants nevertheless contend that Plaintiffs' rights were not violated because there is no right to be free from child abuse investigations. [31, at 9; 34, at 2–3]. Thus, the issue here is not whether government interests outweigh Plaintiff's rights to familial integrity—the answer to that question is an obvious "no," as the lack of reasonable suspicion means there are no government interests at stake. See *Brokaw*, 235 F.3d at 1019 (explaining that "a state has no interest in protecting children from their parents" absent "reasonable suspicion"); *Heck*, 327 F.3d at 521 (explaining that without reasonable suspicion of abuse, "neither the state nor its officials have any interest whatsoever 'in protecting children from their parents,' and no further inquiry (i.e., balancing of interests) is necessary" (quoting *Brokaw*, 235 F.3d at 1019)). Instead, the issue is whether the act of investigating a family for child abuse encroaches upon the right to familial integrity in the first place.

The DCFS Defendants rely on *Croft v. Westmoreland County Child & Youth Services.*, 103 F.3d 1123 (3d Cir. 1997), where the Third Circuit stated that "the right to familial integrity * * * does not include a right to remain free from child abuse investigations." *Id.* at 1125. It also explained that "[w]hatever disruption or disintegration of family life the [plaintiff's] may have suffered as a result of the county's child abuse investigation does not, in and of itself, constitute a constitutional deprivation." *Id.* at 1125–26. This language from the Third Circuit suggests that the act of investigating a family for child abuse never violates the right to familial integrity. However, given binding Seventh Circuit caselaw, the Court does not find *Croft* persuasive here. Specifically, the Seventh Circuit has explained that "unreasonable child-abuse investigations can violate the right to familial relations," *Sebesta*, 878 F.3d at 234, and that "although child welfare caseworkers may investigate allegations of child abuse without violating parents' constitutional right to familial relations, they may not do so arbitrarily," *Heck*, 327 F.3d at 520. Here, based on the allegations of the complaint, Plaintiffs have plausibly contended that the investigation was not based on any reasonable suspicion of child abuse or medical neglect and therefore was unreasonable and arbitrary. Indeed, under the DCFS Defendants' logic, the state could begin an investigation of any family for child abuse at any time and without any reason, all without violating the right to familial integrity. It is hard to square such baseless investigations with the "constitutional presumption that 'fit parents act in the best interests of their children.'" *Heck*, 327 F.3d at 521 (quoting *Troxel*, 530 U.S. at 68 (plurality opinion)). Accordingly, because the complaint plausibly alleges facts from which a trier of fact could conclude that the DCFS investigation was not supported by a reasonable suspicion of child abuse or medical neglect, it states a claim for violation of Plaintiffs' right to familial integrity. See *Holderman v. Walker*, WL

1192441, at *21 (N.D. Ill. Mar. 30, 2021) (finding that the Fourteenth Amendment protects families "from child welfare investigations where there is no reasonable suspicion of abuse").

### b. Clearly Established Law

The DCFS Defendants next argue that even if the investigation violated Plaintiffs' rights, they are nevertheless entitled to qualified immunity because those rights were not clearly established. To overcome a qualified immunity defense, Plaintiffs must demonstrate that their right is clearly established at the time of the challenged conduct. A right is clearly established if its "contours [are] sufficiently clear [so] that every reasonable official would have understood that what he is doing violates that right." *Kemp v. Liebel*, 877 F.3d 346, 351 (7th Cir. 2017) (quoting *Gustafson v. Adkins*, 803 F.3d 883, 891 (7th Cir. 2015)). In determining whether a right is clearly established, the Court first looks to controlling Supreme Court and Seventh Circuit cases. *Id.* A right can also be clearly established by a clear trend in persuasive authority from other circuits. *Id.* Although the Supreme Court cautioned that courts should not "define clearly established law at a high level of generality," "a case directly on point" is not required. *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). The level of specificity needed varies by case. For example, specificity can be "especially important in the Fourth Amendment context, where the Court has recognized that '[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine, [such as] excessive force, will apply to the factual situation the officer confronts.'" *Id.* (first alteration in original) (quoting *Saucier v. Katz*, 533 U.S. 194, 205 (2001)). In other circumstances, "a general constitutional rule already identified may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful." *Michael C. v. Gresbach*, 526 F.3d 1008, 1017 (7th Cir. 2008) (citing *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).

Here, Plaintiffs point to *Brokaw* and *Heck* as clearly establishing their right. [32, at 26–27]. *Brokaw* analyzed whether the removal of a child from his home violated his right to familial integrity. Plaintiffs point to this proposition as clearly establishing their rights: "a state has no interest in protecting children from their parents unless it has some definite and articulable evidence giving rise to a reasonable suspicion that a child has been abused or is in imminent danger of abuse." [32, at 26 (quoting *Brokaw*, 235 F.3d at 1019)]. In *Heck*, caseworkers from the Bureau of Milwaukee Child Welfare received information that a child may have been corporeally punished at a private school in an abusive manner. 327 F.3d at 501. The school's written policy included the use of corporeal punishment, and caseworkers believed that the child's parents "might be complicit in any abuse that may have occurred, since they presumably knew of the school's corporeal punishment policy but did not prevent their child from being spanked." *Id.* at 502. Caseworkers interviewed the boy at his school without his parents' knowledge or consent. *Id.* at 503–04. They then tried to interview the child's parents and sibling; when the parents refused, the caseworkers threatened to remove the children from their parents. *Id.* at 505–06. The *Heck* court found that caseworkers violated the plaintiffs' right to familial integrity when they interviewed the child without the parents' knowledge or consent, threatened to remove the children, and "target[ed] the plaintiff parents as child abusers." *Id.* at 524. The court concluded that by treating corporeal punishment as *per se* abuse, the caseworkers "disregarded the constitutional presumption 'that fit parents act in the best interests of their children.'" *Id.* at 522 (quoting *Troxel*, 530 U.S. at 68 (plurality opinion)).

The DCFS Defendants first argue that Plaintiffs "misrepresent" *Heck* because the *Heck* court explained that it was "by no means suggesting that * * * parents are immune from being investigated for child abuse." 327 F.3d at 523; see also [34, at 2]. However, in context, this

statement does not mean that substantive due process *never* protects parents from being investigated for child abuse. Instead, it means that it does not *always* protect parents from being investigated for child abuse. Thus, the statement is compatible with the determination that investigations without reasonable suspicion violate the right to familial integrity.

Next, the DCFS Defendants argue that *Brokaw* and *Heck* do not clearly establish Plaintiffs' rights because they did not hold that child abuse investigations in general violate the right to familial integrity and instead held only that the specific actions taken by the defendants in those cases violated the right to familial integrity. [34, at 2, 10]. But this argument ignores *Heck*'s determination that "the defendants violated the plaintiffs' right to familial relations * * * by targeting the plaintiff parents as child abusers" when the defendants "had no evidence giving rise to a reasonable suspicion that the plaintiff parents were abusing their children." *Heck*, at 327 F.3d at 524. Here, there was no evidence giving rise to a reasonable suspicion the Plaintiffs abused Baby C, but DCFS nevertheless targeted them as child abusers. Moreover, the DCFS Defendants' argument demands a case with too high of a level of specificity. Child abuse investigations must be based on "a reasonable suspicion that a child has been abused or is in imminent danger of abuse." *Brokaw*, 235 F.3d at 1019. Indeed, the Seventh Circuit has described *Brokaw* and *Heck* as "establish[ing] * * * that the state actors need[] evidence supporting a reasonable suspicion of abuse or neglect in order to report, investigate, and 'indicate'" someone for child abuse. *Sebesta*, 878 F.3d at 235; see also *id.* at 234 (stating that *Heck* "established that unreasonable child-abuse investigations can violate the right to familial relations"). From this rule, "every reasonable official would have understood that" initiating a child abuse investigation for medical neglect without *any* suspicion of child abuse or medical neglect violates the right to familial integrity. *Kemp*, 877 F.3d at 351. A case involving the same investigative steps that the DCFS caseworker

took here is unnecessary to clearly establish Plaintiffs' rights. Instead, the rule articulated by the Seventh Circuit applies with "obvious clarity to the specific conduct in question" here such that the DCFS Defendants are not entitled to qualified immunity. *Michael C.*, 526 F.3d at 1017; see also See *Holderman*, WL 1192441, at *21 ("*Heck* clearly established the right to be free from child welfare investigations where there is no reasonable suspicion of abuse.").

### 2. Personal Involvement

The DCFS Defendants next argue that even if the investigation violated Plaintiffs' clearly established rights, they cannot be held liable for the violation because they lacked personal involvement. [31, at 6–8]. To their point, "individual liability under § 1983 requires 'personal involvement in the alleged constitutional deprivation.'" *Minix v. Canarecci*, 597 F.3d 824, 833 (7th Cir. 2010) (quoting *Palmer v. Marion Cnty.*, 327 F.3d 588, 594 (7th Cir. 2003)). The DCFS Defendants contend that because they were not involved in the investigation, they cannot be held personally liable for any constitutional deprivation the investigation caused. However, this argument construes the personal responsibility requirement too narrowly. An official need not directly participate in a violation in order to cause a violation. See *Palmer*, 327 F.3d at 594. Instead, "[a]n official causes a constitutional violation if he sets in motion a series of events that defendant knew or reasonably should have known would cause others to deprive plaintiff of constitutional rights." *Hernandez ex rel. Hernandez v. Foster*, 657 F.3d 463, 487 (7th Cir. 2011) (quoting *Brokaw*, 235 F.3d at 1012); see also *Brokaw*, 235 F.3d at 1012 (explaining that an "official satisfies the personal responsibility required of § 1983 * * * if the conduct causing the constitutional deprivation occurs at her direction or with her knowledge or consent" (quoting *Smith v. Rowe*, 761 F.2d 360, 369 (7th Cir.1985))).

Here, the complaint alleges that the DCFS Defendants had direct involvement in the

creation, dissemination, and implementation of the *per se* medical neglect policy. [1, at ¶ 43]. They also instructed and allowed DCFS caseworkers to threaten and coerce families who refused eye ointment treatment. [*Id.*, at ¶ 50]. At the same time, the DCFS Defendants knew that refusal of the eye ointment treatment was not medical neglect. [*Id.*, at ¶ 53]. By implication, Defendants knew that the *per se* medical neglect policy would result in DCFS investigations where there was no reasonable suspicion of child abuse or medical neglect. Key here, the Seventh Circuit has determined that defendants who "personally were responsible for creating the policies, practices and customs that caused the constitutional deprivations" can be held liable under § 1983. *Doyle v. Camelot Care Centers, Inc.*, 305 F.3d 603, 615 (7th Cir. 2002); see also *Edwards v. David*, 2017 WL 2653077, at *10 (N.D. Ill. June 20, 2017) (finding that a state actor could be liable under § 1983 because he "knew of and was personally responsible for creating the policies and practices that caused a constitutional injury," and collecting cases finding the same); *A.M. ex rel. J.M.K. v. Luzerne Cnty. Juv. Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004) ("Individual defendants who are policymakers may be liable under § 1983 if it is shown that such defendants, 'with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm.'" (alteration in original) (quoting *Stoneking v. Bradford Area Sch. Dist.*, 882 F.2d 720, 725 (3d Cir.1989))).

Defendants' reliance on *Woods v. Maryville Academy*, 2018 WL 6045219 (N.D. Ill. Nov. 19, 2018), is unpersuasive. [31, at 7–8]. There, the court found that the DCFS Director was not personally involved in the abuse of a child occurring at a state facility—even though the Director knew abuse occurred at the facility—because he played no role in placing the child at the facility. The court did explain that the Director's "exercise of a higher-level management role does not comport with personal responsibility for the challenged placement decision." *Woods*, 2018 WL

14

6045219, at *4. However, this statement does not mean that those in higher-level management roles can never be personally responsible for constitutional violations that occur lower in the organizational hierarchy. And key here, there is no evidence that the *Woods* plaintiff alleged that his placement occurred due to a policy implemented by the Director. Because the complaint here alleges that the DCFS Defendants created and implemented the *per se* medical neglect policy despite knowing that it would cause DCFS investigations without reasonable suspicion, they are proper defendants here. See *Holderman*, WL 1192441, at *21–22 (finding that DCFS administrators who enacted a *per se* medical neglect policy could be liable under § 1983).

### 3. Sovereign Immunity

Finally, the DCFS Defendants argue that, even though they are being sued for damages in their individual capacities, they are shielded by the Eleventh Amendment. [31, at 11–12]. "The Eleventh Amendment bars private litigants' suits against nonconsenting states in federal courts, with the exception of causes of action where Congress has abrogated the states' traditional immunity through its powers under the Fourteenth Amendment." *Joseph v. Bd. of Regents of Univ. of Wis. Sys.*, 432 F.3d 746, 748 (7th Cir. 2005). State officials sued in their individual capacities "are 'persons' within the meaning of § 1983" and the "Eleventh Amendment does not bar such suits." *Hafer v. Melo*, 502 U.S. 21, 31 (1991). "But even when a suit is against a public officer in his or her individual capacity, the court is obliged to consider whether it may really and substantially be against the state." *Luder v. Endicott*, 253 F.3d 1020, 1023 (7th Cir. 2001). "[A] suit is against the sovereign if the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration, or if the effect of the judgment would be to restrain the Government from acting, or to compel it to act." *Id.* (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 102 n.11 (1984)). That said, "[t]he general rule is that" suits

15

against state officials in their individual capacities "are not barred by the amendment, because the plaintiff is seeking damages from individuals rather than from the state treasury." *Id.* at 1022–23. This is true even if "the state chooses to indemnify its employees" and even if "the judgment may exceed the employee-defendant's capacity to pay unless he is indemnified." *Id.* at 1023.

Here, Defendants have done nothing to explain why Plaintiffs' claims should be considered against the state as opposed to against the DCFS Defendants in their individual capacities. *Cf. Luder*, 253 F.3d at 1024 (finding that an FLSA suit is substantially against the state because the plaintiffs sought "to force the state to accede to their view of the Act and to pay them accordingly"). Thus, the suit here is properly against the DCFS Defendants in their individual capacities, and these Defendants are not protected by the Eleventh Amendment. See *Ameritech Corp. v. McCann*, 297 F.3d 582, 586 (7th Cir. 2002) ("[I]ndividual capacity suits do not implicate the Eleventh Amendment's protections, making an exception to Eleventh Amendment immunity obviously unnecessary."); *Brokaw*, 235 F.3d at 1009 (permitting familial integrity claim against state officials in their individual capacities).

\* \* \*

As explained above, accepting as true the allegations of the complaint, Plaintiffs have stated a valid claim that (a) the DCFS investigation violated the Plaintiffs' clearly established substantive due process rights to familial integrity and (b) the DCFS Defendants caused this violation by creating and implementing the *per se* medical neglect policy. Accordingly, the DCFS Defendants' motion to dismiss is denied.[1]

---

[1] The DCFS Defendants also argue that the complaint did not adequately allege that they were involved in a conspiracy. [31, at 9–11]. As explained below, the Court agrees that the complaint did not adequately allege that the DCFS Defendants were involved in a conspiracy with the Silver Cross Defendants. However, because the DCFS Defendants were personally responsible for the constitutional violation, it is not necessary to find that they were engaged in a conspiracy with other actors in order for them to be proper defendants.

### B.     Silver Cross Defendants

Defendants Mistro, Pierson, and Silver Cross also moved to dismiss [23], arguing that they cannot be found liable under § 1983 because they are not state actors.  In order to be liable under § 1983, a defendant must have acted "under color of" state law.  42 U.S.C. § 1983.  Plaintiffs' complaint and briefing suggests two theories for finding that the private Silver Cross Defendants acted under the color of state law: conspiracy and the state action doctrine.

### 1.     Conspiracy

"While a private citizen cannot ordinarily be held liable under Section 1983 because that statute requires action under color of state law, if a private citizen conspires with a state actor, then the private citizen is subject to Section 1983 liability." *Brokaw*, 235 F.3d at 1016.  "To establish § 1983 liability through a conspiracy theory, a plaintiff must demonstrate that: (1) a state official and private individual(s) reached an understanding to deprive the plaintiff of his constitutional rights; and (2) those individual(s) were 'willful participant[s] in joint activity with the State or its agents.'"  *Fries v. Helsper*, 146 F.3d 452, 457 (7th Cir. 1998) (alteration in original) (internal citation omitted) (quoting *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 152 (1970)).  "[A] bare allegation of conspiracy [is] not enough to survive a motion to dismiss for failure to state a claim." *Cooney v. Rossiter*, 583 F.3d 967, 970 (7th Cir. 2009).

Here, the complaint alleges that "[s]ome Illinois pediatricians" "worked with DCFS, hospitals, and physicians to circulate information from DCFS indicating that doctors and hospitals must report refusal of eye ointment as *per se* medical neglect."  [1, at ¶ 46].  It also alleges that "[d]octors, hospital representatives, and DCFS officials and caseworkers attended meetings, engaged in written and verbal communications, and otherwise worked together to develop and disseminate the coordinated DCFS and hospital *per se* medical neglect policies."  [*Id.*, at ¶ 47].

However, these allegations aren't specific to the Silver Cross Defendants. And, as these Defendants argue, "the mere fact that *some* private actors may have had an agreement with the state does not mean that *all* private actors"—such as the Silver Cross Defendants—"were part of a conspiracy or had an agreement with the state." [33, at 2–3]. In fact, the complaint contains no allegation about any agreements that Defendants Mistro and Pierson made with a state actor, only that they acted based on the hospital's *per se* medical neglect policy. [1, at ¶¶ 24, 28]. The complaint alleges that Defendant Silver Cross maintained its "medical neglect-reporting policy as a result of coordinated efforts between DCFS, hospitals, and physicians." [1, at ¶ 56]. However, allegation is too conclusory to support a conspiracy claim. See *Cooney*, 583 F.3d at 970.

Resisting this conclusion, Plaintiffs cite to three cases in which courts have allowed a conspiracy claim to stand. However, in those cases, the courts found an agreement between the private and state actors. See *Dennis v. Sparks*, 449 U.S. 24, 28 (1980) (finding that the plaintiffs stated conspiracy claim between private and public actors when complaint alleged that private parties bribed a judge and were therefore "jointly engaged with state officials in the challenged action"); *Adickes*, 398 U.S. at 157 (reversing summary judgment for the defendants because a reasonable jury could find that a police officer "reached an understanding" with a restaurant employee to violate patron's right to equal protection); *Brokaw*, 235 F.3d at 1007, 1016 (finding that plaintiff stated conspiracy claim between two private actors and a deputy sheriff when all three "decided to file 'baseless and scurrilous' claims of child neglect" in an attempt to get the parents of the child to divorce). Instead of supporting Plaintiffs' conspiracy arguments, these cases highlight the absence of an alleged agreement—and therefore the absence of a plausible conspiracy—here.

2.      **State Action Doctrine**

A private actor can also act under the color of state law pursuant to the state action doctrine. *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 823 (7th Cir. 2009). "At its most basic level, the state action doctrine requires that a court find such a 'close nexus between the State and the challenged action' that the challenged action 'may be fairly treated as that of the State itself.'" *Id.* (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974)). Courts have articulated a variety of tests under which to analyze whether a private person engages in state action. *Id.* Plaintiffs' argue that the Silver Cross Defendants engaged in state action under the joint action test or the state compulsion test.[2]

First, Plaintiffs' suggest that the Silver Cross Defendants acted under the color of state law because they were "jointly engaged with state officials." [32, at 20]. Under the joint action test, "[a] private defendant acts 'under color of' state law for purposes of Section 1983 when he is 'a willful participant in joint action with the State or its agents.'" *Malak v. Associated Physicians, Inc.*, 784 F.2d 277, 281 (7th Cir. 1986) (quoting *Dennis*, 449 U.S. at 27). "A charge of joint action amounts to alleging some agreement between private and public actors to violate plaintiff's constitutional rights." *Cunningham v. Southlake Ctr. for Mental Health, Inc.*, 924 F.2d 106, 107 (7th Cir. 1991). "This requires 'evidence of a concerted effort between a state actor and that individual.'" *L.P. v. Marian Cath. High Sch.*, 852 F.3d 690, 696 (7th Cir. 2017) (quoting *Fries*, 146 F.3d at 457). And, specific to this case, "merely filing a report of child neglect with a state actor, even if false, is insufficient to create liability" under § 1983. *Brokaw*, 235 F.3d at 1016.

---

[2] The Court recognizes that "formulations" of the state action doctrine "are susceptible to semantic variations, conflations and significant overlap in practical application" and "that they 'lack rigid simplicity.'" *Rodriguez*, 577 F.3d at 823 (quoting *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001)). By describing these subsets of the doctrine, the Court does not mean to overlook the doctrine's complexity or the fluidity of its tests. Instead, the Court hopes to provide a useful analytical framework to apply to the facts here.

Plaintiffs' suggestion that the Silver Cross Defendants are state actors under the joint action test fails for the same reason their conspiracy argument does: the complaint makes no allegation of an agreement or "concerted effort" between DCFS and these specific Defendants. *L.P.*, 852 F.3d at 696 (quoting *Fries*, 146 F.3d at 457).

Next, the Plaintiffs invoke the state compulsion test, arguing that the Silver Cross Defendants were state actors because DCFS's medical neglect policy "as circulated to pediatricians and hospitals by doctors and DCFS, and incorporated into Silver Cross's policy" "induced Mistro and Pierson to threaten to report or to report the plaintiffs to DCFS." [32, at 20]. Plaintiffs also suggest that "[t]o the extent that any medical professionals assert that they were *required* to report refusals of eye ointment" to DCFS, they were state actors under the compulsion test. [*Id.*, at 20 n.4]. Under the compulsion test, "a State normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982). However, as Plaintiffs note, the DCFS medical neglect policy requires DCFS to treat reports that parents refused the eye ointment as medical neglect; it does not require medical practitioners to report the refusal.[3] [32, at 20]. The complaint also alleges that certain private actors worked with state officials to implement a corollary policy at hospitals, whereby medical practitioners agreed to report the refusal of eye ointment to DCFS. [1, at ¶ 46–49]. However, the complaint does not allege that the Silver Cross

---

[3] Even if the state did require this reporting, such requirement might nevertheless be insufficient to convert the Silver Cross Defendant's actions into state action because "'something more' than merely acting in conformity with a state statute is necessary to warrant the characterization that a private party is a 'state actor.'" *Proffitt v. Ridgway*, 279 F.3d 503, 509 (7th Cir. 2002) (Ripple, J., concurring in part) (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 939 (1982)); see also *Mueller v. Auker*, 700 F.3d 1180, 1191–92 (9th Cir. 2012) (finding that private hospital "did not become a state actor simply because it complied with state law requiring its personnel to report possible child neglect to Child Protective Service").

Defendants collaborated with the state in these efforts and, even if it had, it is not clear that such collaboration would amount to an exercise of the state's "coercive power" or a "significant encouragement." *Blum*, 457 U.S. at 1004; *cf. Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982) (explaining that the state action doctrine is necessary in part to avoid situations where "private parties could face constitutional litigation whenever they seek to rely on some state rule governing their interactions with the community surrounding them")

* * *

To conclude, Plaintiffs did not allege facts sufficient to demonstrate that the Silver Cross Defendants conspired with state actors or to demonstrate that they were otherwise acting under the color of state law. As such, the Court grants these Defendants' motion to dismiss the claim against them [23].

## IV. Conclusion

For the reasons stated above, the Court denies Defendants Walker and Harms-Pavelski's motion to dismiss [30] and grants Defendants Silver Cross, Mistro, and Pierson's motion to dismiss [23]. Plaintiffs' claims against the Silver Cross Defendants are therefore dismissed without prejudice. Plaintiffs are given until May 12, 2021 to file an amended complaint if they wish to do so. If Plaintiffs wish to stand on the claims that remain from their original complaint, they should so advise Defendants and the Courtroom Deputy.

Dated: April 12, 2021

Robert M. Dow, Jr.
United States District Judge